# The Ocean City Railroad Company

## *v.*

## Thomas Bray et al.

1. A railroad company will not be enjoined from proceeding to construct a road, on the strength of an award in condemnation proceedings for a right of way, where it was enjoined prior to the condemnation proceedings, as that is enough to put it in contempt unless its action is justified by the award.

2. It is beneath the dignity of the court to entertain a suit of a landowner to enjoin the construction of a railroad, the land not being worth more than $5.

3. A landowner should not be aided by injunction to prevent construction of a railroad, his purpose being merely to prevent competition with another road.

4. Injunction to prevent interference with the construction of a road by a railroad company will not be granted where there is doubt as to its title to the right of way under condemnation proceedings, because, before award of damages by commissioners, a *certiorari* removing the appointment of the commissioners and the proceedings to the supreme court was allowed, without any statement whether it should operate as a stay of proceedings, and because there is doubt whether the act of February 25th, 1880 (*Rev. Sup. p. 831*), providing that *certiorari* to remove proceedings by commissioners appointed to assess damages for land required for construction of a railroad shall not stay proceedings by the commissioners, is not unconstitutional, even if construed merely as requiring the *certiorari* to recite that it is to operate as a stay if such is to be its effect.

On bill, supplemental bill, and answer to the original and to the supplemental bill and also cross-bill. Motion for injunction.

The contest in this cause is over a right of way for a railway across a wholly unoccupied, unused and worthless island, in one of the inland, shallow tidal waters of Cape May county. The object of the railroad company is to cross this inland water, including the island, and reach the sand beach on the ocean.

The defendant Bray bought the island, confessedly, at the instance and with the money of another railroad company, which already has a railway line running to the point in question, for

the purpose of obstructing the complainant in the prosecution of its enterprise.

The parties interested in complainant's railroad, before they were duly incorporated, in anticipation of their incorporation, procured a license for the right of way from a person whom they supposed to be the owner. Ascertaining, afterward, that this party was not the owner, they made application to the proprietors of West Jersey to obtain title from them, but the old railway company was more diligent, and procured the title to be vested in one Wright, who conveyed to the defendant Bray, who holds it entirely in the interest of the old railway company. In the meantime the complainant had duly organized its railroad company under the statute, and taken partial possession, and commenced construction of its road across the island. The defendant Bray, with the aid of the servants of the old railway, attempted to obstruct it by force. Each party then applied to this court for injunctive relief; defendant Bray obtained an absolute injunction against the complainant further proceeding. That injunction, on motion, was dissolved, but was continued, first by the chancellor and then by an order of the court of errors and appeals, and is now standing against the complainant. The complainant, at about the same time—all in the month of June last—applied to another judge of the court for an injunction against Bray and the old railway. On that an order to show cause was granted, but no proceedings were had under it on account of the previous injunction obtained by Bray against the complainant.

The complainant then instituted proceedings to condemn its right of way, treating Bray as the owner, and for that purpose applied to the justice of the supreme court in whose circuit the lands lie, for the appointment of commissioners. The justice fixed a day and notice was given to Bray. He appeared by counsel and opposed the application on various grounds. The objections were all overruled and the commissioners were duly appointed.

After the complainant's counsel had left the presence of the judge, and so in his absence, counsel for Bray applied to the

judge for a *certiorari* removing the order of appointment and proceedings to the supreme court, and he allowed it simply, without stating in writing whether it should or should not operate as a stay of the proceedings.

The complainant, relying on the act of February 25th, 1880 (*P. L. of 1880 p. 51; Rev. Sup. p. 831; Gen. Stat. p. 2651*), proceeded before the commissioners to assess and appraise the damages. The defendant Bray appeared under protest and was heard upon the question of value. Two of the commissioners made an award, fixing the damages and value at $1.69. This amount was tendered to Bray, who declined to receive it, and then, upon an order of the judge who made the appointment, that amount was paid into court.

The defendant Bray did not appeal from this award, but several days afterwards applied to a judge of the supreme court other than the one who had allowed the first *certiorari*, for another *certiorari*, to remove the award to the supreme court, which was also allowed simply, without any written expression as to whether it should operate as a stay or not.

Counsel for the complainant moved each of the judges who had allowed the *certiorari*, for a special order declaring that they should not operate as a stay, and each declined to make such order.

After the making of the award and a sufficient time had elapsed for an appeal, and after the allowance of the second *certiorari*, the complainant filed its supplemental bill in this court, setting up the facts which had occurred since the filing of the original bill, and asked for an injunction against Bray and his associates from interfering with their possession of the premises. Bray answered, and combined in his answer a cross-bill, in which he prayed an injunction against the complainant remaining in possession or doing any acts upon the land on the strength of the award. Both applications were heard at one time.

*Mr. Robert H. McCarter*, for the complainant.

*Mr. Samuel H. Grey, Mr. J. H. Gaskill* and *Mr. H. M. Snyder*, for the defendants.

PITNEY, V. C.

. I decline to grant the injunction to the defendant Bray on three grounds :

*First.* He already has an injunction against the acts of the complainant sufficient to put it in contempt of the court, unless its action is justified by the award, and defendant can test that question by a motion to punish for contempt.

*Second.* The value of the land in controversy, from Bray's standpoint, is beneath the dignity of this court. No question was made but that the award was a fair one as to value, and the affidavits show that the value of the property does not exceed $5, and, apparently, it is incapable of beneficial use, except for a *second* railroad.

Dr. Story (*Story Eq. Pl.* § *500*), after stating the familiar reasons why the court will not entertain suits for trifling matters, says :

"In England the rule of the courts of equity is not to entertain a bill under the value of ten pounds sterling, *or forty shillings per annum in land,* except in special cases, such as in cases of charity, in cases of fraud and in cases of bills to establish a right of a permanent and valuable nature."

He cites numerous authorities in the notes, to support this position, and I have taken the trouble to examine them, so far as they relate to land.

In the old book "Cursus Cancellarie," published in 1723, in stating the grounds which will constrain the court to refuse to entertain a suit, it is said (at *p. 9*) :

"Or if it be for land not worth forty shillings a year, or for anything else under the value of ten pounds, those are regularly disallowed here ; and sometimes upon notice taken thereof by the court upon motion, or upon affidavit only, before the cause comes to a hearing, it is dismissed ; but if not, when it comes to a hearing it is dismissed."

And then cites several cases from Cary's Reports. Among them I refer to *Townly* v. *Osney, Cary (16mo. ed. 1820) 105,* where the report is : "That it appeared, as well by the plaintant's bill, as that Osney, one of the defendants, hath made oath

that the lands in the bill is not worth forty shillings per annum; therefore dismissed generally, and not without costs."

And again, in *Morgan* v. *Ap. Richard and Lewis, Cary 121:* "Ap. Richard maketh oath that the lands complained of are under forty shillings by the year; therefore dismissed."

Both these cases were decided in *21 and 22 Eliz.*

In *Babb* v. *Dudeney, Toth. 155* (see *1 Eq. Cas. Abr. 75*), the court declined to grant a partition because the matter was but £9 a year.

For other cases, both ancient and modern, see *4 Chit. Eq. Dig. (4th. ed.) 3242*, and *Swedesborough Church* v. *Shivers, 1 C. E. Gr. 453; Allen* v. *Demarest, 14 Stew. Eq. 162; 1 Dan. Ch. Pr. 328, 329.*

In the case in hand, it is further to be observed that the construction of the railway upon the island will increase rather than diminish the value of the strip taken.

In the third place, I think the court ought not to help the defendant, because he is asking the extraordinary aid of the court for an inequitable purpose. And I refer, in support of that position, to *Piedmont Railway* v. *Speelman* and *Mayer* v. *Piedmont Railway Co.* (*Court of Appeals of Maryland, June 23d, 1887*), *67 Md. 260.* One of the head-notes is: "A court of equity will not lend its aid to an assignee of the lease of land through which a railroad company seeks to condemn a right of way, and enjoin it from so doing, when it is shown that the assignee is the president of a rival road, and denies the power of the first company to condemn the land under its charter, but will leave him to his remedy at law."

With regard to the injunction asked for by the complainant railroad company, it also is in no position to ask the aid of the extraordinary power of the court. It is not asking for the enforcement or administration of any primary equitable right, but for its protection in the enjoyment of a legal right; and in such case the rule applies that its legal right must be clear. And how fully soever I may appreciate the inequitable conduct of the defendant, I must not be moved by that consideration to grant to the complainant aid to which it is not clearly entitled;

and if any serious doubt is thrown upon its title by the allow-
ance of the two writs of *certiorari*, I must deny its prayer for
interim relief and leave it to its remedy at law.

Complainant relies upon the act of 1880, above referred to.
In turn, the defendant denies the constitutionality of that act,
and claims that the writs of *certiorari* operate, *ex proprio vigore*,
as a stay.

The practice seems to be well settled for judges of the
supreme court, in allowing writs of *certiorari*, to state in
writing, whenever they see fit to do so, whether they shall or
shall not operate as a stay. So that their power to declare
whether they shall or shall not so operate seems to be well
settled.

Now conceding, as of course I must do, that it is beyond the
power of the legislature to take away the right of the supreme
court to allow a writ of *certiorari*, with all its consequences,
including the stay of all further proceeding under the proceed-
ings removed, yet I am of the opinion that it is within the
power of the legislature to so far regulate the use of the writ
and the practice under it as to compel the judge of the supreme
court who allows the writ to expressly declare that it shall
operate as a stay if he so intends ; and the legislature having
that power, I am inclined to think that it is possible to give
effect to the act in question within the limits of the constitution
by construing it as imposing that duty upon the judge allowing
the writ.

But this is a mere suggestion of my own, and I cannot be at
all sure that the supreme court will ever adopt it. Indeed, the
latest utterances of that court to which my attention has been
called, found in the report of the case of *Green* v. *Jersey City*,
*13 Vr. 118* (at *pp. 121, 122*), are against the construction which
I have suggested.

I am informed that the ground on which the second writ was
allowed was that the judge was in doubt whether the effect
of the first writ was not to absolutely stay further proceedings
under the appointment of commissioners.

With regard to the effect of the second writ, my impression

is that it could not affect the complainant's right to proceed under the award. If the title once vested under the award, then the mere allowance of a. *certiorari* to remove the award to the supreme court would not, as it seems to me, have the effect of divesting its title. That result would only be attained by an actual setting aside of the proceedings, including the award. In other words, the title would vest by the signing and filing of the award, subject to being divested by judgment setting it aside.

But, with regard to the first writ removing the proceedings before the award was made, I am unable to see how the effect of that can be avoided, and come to the conclusion that so much doubt is thereby thrown upon the complainant's title that I must refuse to grant an injunction protecting it in the premises; and leave it to its rights at law.